Good morning, ladies and gentlemen. Please be seated. We have five cases on the calendar this morning, one from the district court, two from the PTAB, three from the PTAB, and one from the Merit Systems Protection Board. One of the patent cases and the MSPB case is being submitted on the briefs and will not be argued. The first case this morning is Clifford Lowe v. Shieldmark, LLC, 2023, 1786, 1871, and 1893. Mr. Weber. Mr. Weber, let me ask you to begin with. You note 13 issues, which is a good way to lead our focus and make it difficult to review the case. I assume standing is the key issue, and is that what you want to principally address? That's at least the first one, Your Honor, and I think with that one and maybe addressing just briefly the false advertising, we can move this case to resolution or disposition. To please the court, I am Ray Weber. I'm here with my partner, Lord General Corriston, with me throughout. And Mr. Lowe, who is a plaintiff and appellant and also the managing member of SPOTA, is also here with me. The issue of standing needs to focus on the non-exclusive license agreement that was given by SPOTA to Insight Delaware. Well, first, Lowe lacks standing because Lowe assigned the patent, right? Lowe assigned the patent. When we started the case, Lowe owned the patent. And his company, SPOTA, was a licensee. That was by an oral license, and oral licenses are certainly acceptable. But they're hard to prove. They're difficult. Well, here we have a situation where the document itself, the license agreement and the asset purchase agreement, reference that fact. And it's acknowledged by Insight Delaware that Mr. Lowe had a license and that the patent was now owned by SPOTA. All that happened was Mr. Lowe and his company changed positions. Issues didn't change. The issue of infringement didn't change. The patent didn't change. All that happened was that those two interchanged positions. But that's a big difference. SPOTA may have had standing because it owned the patent, but Lowe no longer owned the patent during part of the litigation. Mr. Lowe was given an oral license also. Mr. Lowe was both SPOTA's managing partner, managing member, and Mr. Lowe. He was representative of the party, and he was a party. And the documents themselves state that SPOTA is now the owner, and Mr. Lowe is a subject of an oral license. So SPOTA has standing. I'm sorry? So SPOTA has standing as the owner. Yes, SPOTA does have standing as the owner. SPOTA has been in it throughout. So has Mr. Lowe been in it throughout. Mr. Lowe remained in it with an oral license that is referenced in the license agreement with Delaware. Well, it isn't by its terms referenced, I believe. Is that correct? In fact, I think you're talking about Section 2.3 of the license with Delaware. And that section says that Lowe and Shielmark have a right, if I recall it, have a right to sue with respect to the pre-December 6, 2021 infringement, correct? That's correct. Right. But it doesn't say because of an oral license. You're saying there's an implication from that that there must have been some agreement between Lowe and SPOTA by which he renewed his rights to sue for that period. Right. Because as of December 6, as I understand it, he's given up all his rights. Well, as of December 6, he had assigned the patent to the company. And he had nothing left. Well, in return back for the license for him to be able to continue this existing litigation to cover the window of time that he was the owner and he had licensed his company. The only reason for this change was the asset purchase agreement with Delaware, with Insight Delaware, wanted to have it only between two business entities so that the assets were all owned by one entity, the assets for making the product, producing the product, selling the product, and the patents. There were a number of patents that Mr. Lowe owned. Two of them, one of them is at issue here, and the other one was also related to that business. And those were carved out of the asset purchase agreement and then made the subject of a license so that Mr. Lowe and his company could continue the litigation to recover for the damages they experienced while they were making it, making and selling the product, before they transferred the company, the company's assets, to Insight Delaware. It was just, it was a mechanical process so that the transfers were between the two companies. All that Lowe did was sell, not sell, transfer his ownership right in the patent to his company, or to the company, the company giving him back a license so that all they did was change positions. Was that, in your view, an exclusive license given back to him, or was it a license to sue for the earlier time, or was it a license that was shared between him and Spada? Well, Spada certainly had a license. Well, let me ask the question more clearly, perhaps. Did Spada, after this oral agreement with Mr. Lowe, continue to have a right to sue for the pre-December 9, 2021 infringement? Yes. But in your submission to the district court at 2703, you referred to his transfer, the transfer to him of the right to sue for that period as exclusive, not including Spada. Whereas now you're saying, and you said in the section 2.3 of the December 16th agreement, that it was his right alone. If you look at 2703 of the appendix, you'll see this is an exclusive right to continue to assert infringement. Okay. And where were you looking, Your Honor? All right, if you look at the line 3, line 4, Lowe granted Lowe exclusive right to continue to assert infringement. And then at 2.3 on appendix 1810, you say this is a right of Lowe and the company. Well, granted Lowe the right of exclusion. That's different from an exclusive right. Exclusive right means he's the only one that has the right. A right of exclusion means that you can exclude somebody else. I read this quite clearly as an exclusive right. Well, I believe that was at a point in time, I do remember this, that the exclusionary rights were shared between Lowe and his company. All right. Well, that's certainly the position you take at 2.3. The reason I think this matters, at least to me, is because it casts some doubt on the terms of this putative oral license. Was there an oral license? What were its terms? And that would lead one to, if one feels that there isn't proof of an oral license, that would mean that Mr. Lowe never got back the right that he gave up as of December 9th, 2021, where he clearly gave that right to sue for past infringement to SPOTA. Am I right about that? Well, I understand your argument. That's a question. You're absolutely right. I apologize for that. I understand where you're coming from. But what was happening here was just teeing it up for the business transaction that involved Delaware. Because it was one week after this that the agreement with Delaware was entered into, where Delaware had the asset purchase agreement, which included everything except for the two patents that were involved in manufacturing the product, and one of which was at issue in this litigation. And the bargain for agreement was, we're selling you all the assets for continuing to run the business, but the company and Mr. Lowe were damaged by the infringements that were ongoing before this transfer. And it was an asset purchase agreement where they weren't interested in buying litigation or whatever. What they wanted to do was to go on with the business. So Mr. Lowe, I'm imagining, gets less than he could have gotten for the sale of these assets because he needs to continue the litigation to recover the damages he suffered during the infringements. The infringements are just for that window. Can I just ask a quick question to make sure we're all on the same page here? I take it that it's clear from the law that a person who transfers ownership of a patent does not lose standing to sue for the period of infringement that occurred during the period in which that person owned the patent. That's pretty clear, right?  You agree with that? Yes. Right. So Mr. Lowe, if Mr. Lowe, in fact, had the rights to sue for that period and didn't give them up or got them back, he gave them up on December 9th. But if he got them back in the oral agreement, then he does have standing to sue for that period, right? Right. Okay. But everything turns on whether there was such an oral agreement, which we don't have really any direct evidence of. There's no declaration or anything like that in support of the proposition that there was an oral agreement. It seems to me you're basing your position entirely on the implications from Section 2.3, right? Which is a written document, and it's acknowledged by the buyer here, by Delaware, that that is, in fact, the case. Okay. I mean, it's not just the two of them. It's also Delaware saying, that's right. How would Delaware know? Pardon? How would Delaware know? They don't have direct knowledge that there was an oral agreement between Mr. Lowe and Spada. No, and that's true. But there's no evidence to the contrary. They're saying that this is what happened. We're in the midst of a lawsuit. We need to keep everything. We're keeping ownership, good or bad. We're keeping ownership of that lawsuit. Counselor, your time has almost expired, but we're going to give you extra time because of the issues. Judge Rainer has a question. Okay. Counselor, I have a question for you. It seems to me that Mr. Lowe, the only right he has left in the patent is what's conferred to him under 2.3. Is that right? Yes. If we want to see what Mr. Lowe has, we'd look at that particular provision. Is that clear? Yes. Okay, so the right that he gets under 2.3, in your view, is this a right to exclude or is it an exclusionary right? It's a right to exclude. Well, it's certainly an exclusionary right, and it's also the right to exclude because that's what the lawsuit is about. It's seeking damages and an injunction and exclusion. So this right under 2.3, it's temporal in nature. It's limited only to the Shieldmark lawsuit and to settle the Shieldmark litigation, so it's limited only as to the litigation. Did Mr. Lowe retain any right to sue anybody else? Yes. In fact, that's stated in here, that those are the additional. If you're looking at 2.3, the buyer acknowledges Lowe as owner and company as exclusive licensee. That's what they were when the case started, of the licensed patents prior to the effective date, retaining the exclusive rights to maintain, control, and settle the Shieldmark litigation, bear all costs, etc., and also retaining the exclusive rights to enforce the licensed patents for recovery of damages for infringement prior to the effective date. Those were not subsequent to the effective date. That's right. It doesn't say not subsequent. It does not say that. You're correct. But what it says is there were a number of infringers during this period of time. Am I correct that the right is conditional? It's a conditional right that he has. It's conditional in that it covers a period of time. Any infringements before the effective date, he has the right to pursue. And that's the option, the option that Delaware had to acquire full ownership rights didn't kick in and didn't occur until after all the litigations were done. So assuming someone has standing here, and probably at least Spoda does, the court alternatively found that the patent was invalid. Do you want to address that? They found that it was invalid. Well, yes. Well, first of all, I think once the court decided that there wasn't jurisdiction, it should have stopped. In fact, the court even acknowledged that if it went further, it was likely dicta or an advisory opinion. And yet the court went on and gave its dicta and advisory opinion. But the patent certainly isn't invalid over Dornbusch. Tell us why not on the merits. Why not on the merits? Yes, because the court dealt with the merits. Well, Dornbusch. I'm looking at Dornbusch here. Well, one thing I would like to touch on. The court found the entire patent invalid, but yet it only addressed two claims, the two independent claims, which, you know, you might do if you're talking about infringement, but not invalidity. But you did not, as far as I can tell, looking through all the records here of your presentations to the district court, I didn't see where you pointed out particular subdependent claims that you felt retained validity if claim one went down. Because they You focused on claim one. You didn't focus on any of the dependent claims, as far as I could see. Because the claims enjoy a presumption of validity. Well, but if you don't make an argument to the district court that some particular claim is valid, even if the court rejects your argument about other claims, the district court doesn't have an obligation to, and that's a waiver. The district court doesn't have an obligation to go through all the claims and say, with respect to each one, this is invalid because of this, this is invalid because of that. You've raised, as far as I can see, you didn't raise any of the other claims that arguably you might have had a stronger case on than you did on one. And I agree with you on that, Your Honor. But I'm entitled to rely on the presumption of validity until they raise it. But they did raise the question of all. They had a long exhibit in which they went through every limitation of each of the claims and pointed out where that limitation, now those limitations were satisfied by Dorenbush or other prior art. And you did not respond with respect to the dependent claims. So the question is, why haven't you waived your objection to the court's ruling on the conclusion that you, well, the court's failure to talk about any of the other claims? That's the question. Well, I think that is a good part of it. It was the court's failure. If you're saying that it was argued, that it was presented. The dependent claims were not argued by you. That's the point that I'm having trouble with. You didn't come back and say, ah, but you have said that Claims 5 or Claims 13, let's say, were invalid. They weren't invalid, you would say, because Dorenbush doesn't show the limitations that are in those claims. But you didn't do that. That's my problem.  And I understand that. But aside from these dependent claims, you haven't yet addressed why the independent claims are not invalid. Yes, well, thank you, Your Honor. In Claim 1, it's required that the upper surface of each lateral edge portion comprises an extension of the upper surface of the body. And if you look at Dorenbush, you will see that, like Figures 4 or 6, the lateral edge portions that are 13 aren't extensions of the upper surface of the body. They're clearly separate surfaces. It doesn't support a 102 anticipation rejection. And the cross section here is trapezoidal rather than rectangular. But clearly, when you compare that, I know we focus on the claims. But if you look at the drawings of the 664 patent, which is Appendix 45, you can see right on the cover sheet or right on Figures 2 and 3 of the patent that the top surface curves down that the lateral edges are an extension of. There's no line of demarcation there. This is clearly trapezoidal. There's only one top surface on our product. It's a continuing top surface. It would be like saying that the walls in this room are a continuation of the ceiling. Well, they're clearly not. Those are two separate structures. And that structure is important. That structure is important for pallets or skids or whatever going on these industrial, you know, these floors in factories or warehouses. So you're saying that if the arguable extension is curved, it's a smooth curve from the upper surface, that that's an extension, that curved portion. But if it's a bevel with a sharp break, then it's not an extension. That's your argument? Yeah, there's a break there. There's clearly a break. There's not a space. I mean, it goes along and it goes like that. In other words, what you're saying, it seems to me, is here's the top surface. This is the portion that goes beyond the top surface. You're saying if this is curved, it's an extension. But if there is a point at which it has a sharp departure from the angle of the top surface, then it's not an extension. Is that your argument? Well, that is the argument. It's not an extension. Well, the upper surface of each lateral edge portion comprises an extension of the upper surface. The patent treats why that's important for skids and tow motors and things of that nature. We're talking about 102. Mr. Weber, we have your argument on that. And your time has been greatly exceeded. We will give you two minutes for rebuttal. And if Mr. Sheik needs more time, we'll allow that, too. May it please the Court. My name is Dave Shek. I represent the appellate shield mark. When this case started in April 2019, six years ago, there wasn't a standing issue. Lowe owned the patent. And Insight North Carolina, his company, was the exclusive licensee at that time. But that all changed in December 2021 when this case was on appeal and a previous appeal to this Court. When Lowe and Insight North Carolina entered into a series of transactions with a third party, Insight Delaware, in which Lowe sold the entirety of his business and transferred his rights under the patent to Insight North Carolina, which changed his name to Spada. And Spada probably turned around and transferred substantial rights in the patent, keeping only the right to pursue a cause of action against shield mark for damages based on alleged infringing activities before December 16, 2021. And what this Court has characterized that type of arrangement in previous cases is a hunting license. A hunting license. All they had, all Spada had at the end of that transaction was the right, a cause of action, with no other rights to continue to pursue the case. So you say Spada, after December 16, did not have any exclusionary rights? It owned the patent at that point. Well, no, I would respectfully disagree with that. If you consider the entirety of the transaction, not just the assignment from Mr. Lowe to Spada, but if you consider the asset purchase agreement and the patent license agreement, if you look at the rights that were transferred in those agreements and what they were left with at the end of that agreement, we say that they had no substantial rights left in the patent. Spada, as a result of that, can't practice the patented invention. That's prohibited by a non-compete in the asset purchase agreement in Appendix 2812. Spada can't assign or otherwise alienate the patent. And that's prohibited by Section 2.2 of the patent license agreement. But Spada just granted a non-exclusive license to Delaware. Isn't that correct? They granted a non-exclusive license with an option. To sub-license, to further sub-license. Yes, they granted him a non-exclusive license with the right to grant sub-licenses. Yeah. Now, that right to grant sub-licenses basically disables the owner of the patent, but that doesn't mean that the owner doesn't still own the patent. The fact that a sub-licensee can sub-license further means that it may have lost its exclusive right to sue infringers, but it still owns the patent, right? Yes, and, Your Honor, I'm very familiar with your additional statements in the Uniloc case, which came You don't dispute the accuracy of his statements and Judge Lurie's statements. Judge Lurie's statements? Right. The mere fact that the right to sub-license, that mere fact, I agree with that. That alone would not mean that Spada doesn't have ownership or some substantial rights in the patent. It may, but what I'm pointing out is that's not all we have here. If you look at the asset purchase agreement, the patent license agreement, and the non-compete, you see that collection of agreements. And this was a transaction. This was a large transaction. So this Court has said, one, we don't look at labels. Just because you labeled something a license doesn't mean it's necessarily a license. And, two, you've got to look at the entirety of the transaction. And if you look at the entirety of the transaction We may look at labels, but they aren't necessarily conclusive. Correct. Correct. That's correct, Your Honor. And so if you apply that principle here as well as looking at the entire transaction, and that means not just the document that Lowe executed with Insight North Carolina, which became Spada, that assigned the patent over, but then you've got to look at the next series of events, the patent license agreement and the asset purchase agreement with the non-compete in there. And if you look at all of those documents in their entirety, you see that the only thing left at the end of that that Spada has is this cause of action that gets cut off. But it never the patent itself has not been transferred at this point in time to Insight Delaware, as I understand it. There is an agreement that Insight Delaware will have the right to acquire the patent. But I understand, I think, that right now that right has not been exercised and executed. That's correct. So right now the ownership of the patent, at least technically, the owner of the patent is Spada, correct? Yes, but I want to focus on the word technically because, again, if we want to look at ownership in terms of all substantial rights in a patent, to be a patentee, for example, under 35 U.S.C. Section 21, or even an exclusionary right, which I would argue what truly is an exclusionary right if, as a result of the transactions, as a result of these transactions, all you have left is a cause of action to proceed with the lawsuit that gets cut off on December 16, 2021, where Shieldmark has continued past that date to continue to sell the accused Mighty Line tape, and the term of the patent extends until April 2026. So I could look at this two ways. One, all substantial rights, which we all know you must have all substantial rights in a patent to be able to assert a patent. I don't see how they can have all substantial rights in these patents, given what they've given up in the patent license agreement and the asset purchase agreement. Well, somebody has the rights to the patent. Your argument in your brief seems to suggest that the exclusionary right associated with the patent is out there in the ether somewhere and that no one has it. That, it seems to me, can't really be true. So if we agree, and I think you did agree with Judge O'Leary's additional statement, regarding the rights of a patentee vis-à-vis a non-exclusive licensee, if that's true, then it seems to me, and since there is at least the, again, technical right ownership of the patent in SPADA, that SPADA must be the party that has the right to enforce with respect at least to ongoing infringement. How can it be otherwise? Well, clearly not ongoing infringement. It's clear in this record that, and I can cite numerous instances where that is cut off on December 16, 2021, which was the date of the transactions. That's been repeatedly stated. In the appendix 1810 at section 2.3 of the patent license agreement, the law in SPADA retained only the exclusive right to elect to maintain, control, and settle this lawsuit for infringement prior to the effective date, which is December 16, 2021. So that's with reference to the collection of infringement allegations regarding pre-December 9. It doesn't address whether there's any continuing right. But let's assume that there isn't any continuing right for some reason. They still have the right to enforce with respect to the pre-December 9, assuming that there was an oral license. Even whether there was an oral license or not, SPADA has that right, and SPADA and Lowe both had it if there wasn't. Right, so let me take these. I'll take them one at a time so we can focus in on this. With respect to Lowe, yeah, they were relying exclusively on an oral exclusive license that was granted supposedly sometime after this transaction and connection with it, but we know. Well, it was either exclusive or non-exclusive. We don't know which. I'm sorry. I don't want to interrupt you. I'm sorry. No, no. We know from cases such as the Enzo case, 134, Fed 3rd, 1090, 1093, that if an exclusive license is going to be used as a basis for standing, it's got to be in writing. So I don't think, even if there is this oral grant, under the law, I don't think it would fly. And Mr. Lowe, it's got to be remembered, too, in the assignment to SPADA, he assigned absolutely everything, including causes of action. So he assigns everything to them, and then they're saying that he got back, through a verbal agreement, an exclusive license. But under the law, that can't support standing. So I think it's clear with respect to Mr. Lowe that he has no standing. Wait, wait, wait. Can't support standing for Lowe? Yes. You mean because it was oral? Yes. All right. But you don't dispute, I take it, that if there was a valid transfer of the right to sue for pre-December 9, 2021 infringement, if that was transferred to Mr. Lowe, who owned the patent during that period, important point, that he has standing to sue for that period. You don't dispute that. In other words, the proposition is this. Someone who owns a patent as of pre-December 2021 and who later sells it, without transferring the right to sue for that period that they owned the patent, they have standing to sue for that period, correct? We can agree on that, right? Yes, but that's not the facts of this case. But you agree with that proposition? I'll agree with that proposition. But that's not, and I want to make clear, that's not what happened here because he assigned everything. If you look at the assignments, everything. Right, but then that raises the question of whether, assuming the oral agreement both occurred and is legitimate even if not in writing, what he got back, according to Mr. Lowe, is the right to sue for that period. And if he did, are you saying that once he gave it up, he can't get it back? Well, I guess yes in a way, again, if we get back to the facts of this case, because I think when Mr. Weber was here, you raised this, you pointed this provision 2.3 of the patent license agreement. We look at what he got back, and 2.3 says all he got back was this cause of action. This, both spot and look. Which is a cause of action for infringement during a period in which he owned the patent. So the question really is, you mentioned hunting license, and the question is, is this a hunting license if, in fact, the person that's given the license is a person who owned the patent at the time that he's suing for it? That seems to me different from the case in Crown Dye and so forth, where you're giving some third party who had no rights in the patent the right to sue. You can't do that. That doesn't necessarily decide this case with respect to Mr. Lowe, right? I wouldn't, I don't think, respectfully, I don't know if that's a material difference in the context of this case, because I think what happened here was the entire business was sold. And again, you've got to look at the entire transaction. He gave up the right to be in the business entirely, was paid a substantial amount of money for it, and then the only thing that happened here is his company. has the right to continue the cause of action. And I'll grant that there's a claim that that is also something that he's kept, although that was strictly oral. I believe it's clear under the law that that can't support standing. I wanted to, I do want to touch, if I could, if there are no questions, on standing on the issue of patent invalidity. And I think the questions were the right ones, and the focus was the right ones here. That there were only two limitations in the patent that were challenged. That they were challenged not to be adorned. Which one was the... Counselor, before you go, let me go back. I have something that's somewhat troubling me, and it's a very basic issue. But from what I understand is that at one point Mr. Love was the owner of the patent. There were no conditions or any type of provision that would deprive him of any rights within the patent. That changed. When did that change? That changed when he was... Did that change under 2.3 when they entered that agreement? I think it changed before that on December 9th when he executed an assignment with Insight North Carolina, which then changed its name to Spada, where he gave up everything. And at that point, did you remember that Mr. Love was no longer the owner? Correct, and that was in the midst of this lawsuit. So at that point, who was the owner, Spada? For a period of time, when that document was issued, Spada had everything for that. And then a week later, they entered into the patent license agreement and the asset purchase agreement with the non-compete attached, where the entirety of the business went. And then you combine that assignment plus the patent license agreement plus the asset purchase agreement, and then you look at what Spada had at that point, and it's just the cause of action. Well, Spada didn't assign the patent. He didn't grant an exclusive license to the patent. But Spada gave up the right in the non-compete to practice the patent invention. They can't practice the patent invention. Mr. Love can't practice the patent invention. In the patent license agreement, the patent license agreement says you can't transfer the patent to anybody, you can't assign the patent to anybody, you can't enter any agreement. Well, they retained the right to transfer the patent to Insight Delaware. If they exercise the option. If they don't, then I guess it's an open question what they can do. But, yeah, besides the option, for example, they can't turn around and transfer the patent freely to someone that knocked on their door and asked for it. Here's the problem I have with the position you're taking. I alluded to it earlier. Normally, these all-substantial rights go back to Judge Lurie's opinion in Valpelle, which I think was the sort of beginning analysis of this issue. The notion was if you, as patentee, give up to an exclusive licensee, that's a typical case, all rights to the patent, then the exclusive licensee becomes the owner de facto of the patent and has all rights that would inure to a patent owner. That's fine, and we've had all sorts of cases since then that play on that notion. But the idea that if you have a non-exclusive licensee, as in Insight Delaware, who gets a right to purchase the patent at some time in the future if they decide to exercise the right, that that party becomes either the patentee, the way an exclusive licensee with all patent rights is, or either, if not the patentee, then no one is the patentee, which is what you suggest in your brief. It seems to me is unsupported by any authority I could find. Do you have any case in which we have held that there are situations in which where transactions of this sort occur in which no one is the patentee? I have not. I'm not aware of any case like this. I think there's a reason for that. Well, I think one reason is I've never seen an agreement quite like this. I mean, what you have here is two things. By the way, you have two sophisticated companies with highly experienced counsel, and they want to sell the business, and they're in the midst of this lawsuit. They set out to set up an agreement that would keep Insight Delaware out of this lawsuit, just keep them out. They didn't want any part of this lawsuit, so they want to keep them out, but they want to sell the business, and they also want to keep what they can in this lawsuit. They set out to do that, and that's exactly what they accomplished. But I have never seen an agreement quite like this. The other part of it is they have said, and it's unequivocal, that they've admitted, both low and spotty, they have no rights. They're not seeking any rights at all past December, any relief, nothing, past December 16th, 2021. So that, and we have Shieldmark continuing to sell the product, and we have the patent extending to April 2021, so I've never, 2026, and I've never seen that type of situation either, because now Shieldmark is potentially exposed to multiple claims of infringement, multiple parties, multiple lawsuits based on the same product. Counsel, do you want to defend the court's finding of invalidity? Yes, Your Honor. I do, and I think if there's anything that's the most straightforward part of this case, it's that. This patent is unquestionably invalid. Judge Gwynne got that right. They challenged a total of two claim limitations in this entire proceeding. They didn't deny that most of them were in Dornbusch. One was the extension limitation, and the other was the unintentional lifting limitation, and the construction that governs here of the extension limitation is that each lateral portion lengthens the tape body, simple as that, just lengthens it. And Figure 4 of Dornbusch clearly shows a lengthening, and that's all. Now this notion that you need a smooth transaction as opposed to a bevel, and Figure 4 of Dornbusch shows sharp angles and all that, that's irrelevant. The construction is an extension. But moreover, Dornbusch states that the floor mark that is closed there has a substantially flat profile with a gently rising area to make the tape non-interfering, which is exactly what the patent invention does here. So the construction that applies here is just an extension, nothing more. All the things about the functional features, those are outside of what the simple construction was. And in construction, I might add, that they advanced and succeeded in the district court. Were there any arguments that the claim term or the limitation or rather the unintentional lifting, that that itself was indefinite? I'm having a hard time seeing how that can actually be a claim limitation. That's a good point, Judge Radon. I don't recall, you know, this six years of litigation, perhaps at one point that might have been challenged in connection with the claim construction proceedings. But I have to admit, I don't recall what it was. I do know that it was construed by the court. The court did adopt a construction that they advanced. They succeeded in their construction, which is limits but does not prevent lifting, does not entirely prevent lifting. Just as simple as that, limits but does not entirely prevent lifting, which is something that Dornbush talks about over and over and over again, about how the tape remains in place without being dislodged and it resists lateral forces to remain in place during use and it may be lifted from the surface when it's no longer needed. If we find that no present plaintiff has standing, do we need to vacate the finding of invalidity? I think there's, no, I don't think that's necessary, and here's why. Judge Gwynne found this as an alternative. That's how he handled it, and he did handle it that way. However, if you look at this record, Shieldmark alleged a counterclaim for a declaration of invalidity of this patent, and that was pending. That counterclaim existed, and despite the finding of lack of standing, as I mentioned, what about the December 17, 2021 forward period when Shieldmark has continued, as it believes it has the right to do, to sell these products. Now we're talking, what, five years of sales, and it's going to continue to do so, it believes, all the way to the end of the patent. So it faces a real concrete threat that it's going to be accused of infringement based on its sales after December 16, 2021. So I believe that... By whom? It could be, it depends on how the agreement works out. Well, but if you're right, that there's no standing for either Spada or Mr. Lowe, the only party still standing is Inside Delaware. So if they were to exercise the option, we would be exposed by Shieldmark to be Inside Delaware. However, if they don't exercise the option, or if the agreement were changed... Well, you're saying they have, well, go ahead. Yeah, the agreement could be changed. It's a contractual arrangement between three mutually interested parties. It could be changed. In the cases that I'm aware of on this issue, one critical thing is there has to be some pretty clear clarity or certainty that we're not going to see this again. And that certainly doesn't exist here when we have these... In fact, the vast majority of time where they're still exposed. Inside Delaware is not a plaintiff here. Is that correct? That's correct. That's correct. Counsel, I think we have your argument, and you've gotten an amount of time, I think, comparable to appellant. So thank you very much. Thank you. Mr. Weber, we'll give you two minutes rebuttal. Real quickly on the validity issue. I go back again. Ceiling and walls aren't extensions. If you look at the drawings, you can see what's meant by an extension of the top surface as compared to one that is clearly a demarcation aside, a beveled side. The other thing is in Claims 1 and 11, there's a requirement of an adhesive securing the lower surface of the body to the uppermost surface of the floor. So you got an adhesive to secure in the context of the invention. You read Dorenbush. Dorenbush gives about two sentences to the possibility of using an adhesive. It never shows the adhesive in the drawing. It says it may be a thin layer of an adhesive with a low degree of adhesion. It may be used to enhance the spot marker's non-slip characteristic. That is talking about when you have this on the floor and the athlete's foot hits it, you don't want the decal or the spot marker to slide. That would be very, very dangerous. So there is a little, their patent talks about a grid on it to prevent that. And to prevent slipping a little more, you might put on a low tack adhesive with a low grade of adhesion. Keeping in mind that Dorenbush is talking about removable, replaceable. Just as you're there setting up the different plays that you're going to do, you want to pick these up and move them along. They're talking about slipping. They're not talking about securing and protecting against removal. And we're talking about a 102 restriction here. And it's the same thing with the ceilings and the walls. But looking quickly to... Very quickly, your time has just about expired. Do you have a final thought? Well, yeah. The agreement does contemplate not only this litigation, but further future litigations. Section 1.2 of the license agreement talks about other additional litigations for this window of time in which Lowe owned the patents and Spoda was a licensee. And the non-compete agreement gave no enforcement rights. You know, there was a non-compete, but patents are exclusionary. And that's what they held on to. Didn't grant anything except the machinery, the equipment, the extruders, all that, and specifically excluded the patents. Thank you, Mr. Weber. Your red light is on. We've been very liberal with time because you raised so many issues. The case is submitted. Thank you, Your Honor.